UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JUSTIN LIGERI, a single person, and ET Costumes & Wigs, a Rhode Island company,<br><br>**Plaintiff,**<br><br>v.<br><br>CALIFORNIA COSTUME COLLECTIONS INC., a California Corporation, and RICK Lieberman ~~l/n/u, and JANE DOE l/n/u, husband and wife and the marital community comprised thereof~~,<br>Rick Lieberman<br><br>**Defendant.** | [redacted] 05 237S<br><br>No.:____________________<br><br>COMPLAINT FOR DAMAGES |

COMES NOW the plaintiff in the above entitled cause of case, and alleges as follows:

I. JURISDICTION

1.1 This action brings a Federal question jurisdiction upon Federal law. 28 U.S.C. § 1331.

1.2 This action brings Diversity of Citizenship jurisdiction, by an amount exceeding $75,000, and between citizens of different states. 28 U.S.C. § 1332 (a) (1).

## II. VENUE

2.1 This action properly lies in the District of Rhode Island, where events and omissions gave rise. 28 U.S.C. § 1391. (a) (2).

## III. PARTIES

3.1 Plaintiff, Justin Ligeri, owns and operates ET Costumes and Wigs, a business operating predominantly on the internet, which specializes predominantly in the retail sale of costumes, wigs, and like accessories, whose primary place of business is in the State of Rhode Island.

3.2 Defendant Rick, in his capacity as sales representative for Defendant California, and Defendant Rick personally, for any action taken outside of his employment agreement with Defendant California.

3.3 Defendant California is a company incorporated in California, that does business in Rhode Island.

## IV. STATEMENT OF FACTS ON BREACH OF CONTRACT

4.1 Plaintiff relies on contracted relationships with various costume, wig, and accessory wholesalers (hereafter contractors), to purchase wholesale products for retail to the marketplace.

4.2 After extensive salesmanship on the part of Defendant Rick, in representation of Defendant California, Plaintiff agreed to carry certain of Defendants' product lines by entering into a series of ongoing severable and installment contracts with Defendants (extending with no definitive end, but clearly through at least Plaintiff's business season end on October 31st, 2005).

4.3 The expressed, implied, oral, and written elements of the aforementioned contracts, stated, with no ambiguity, that Plaintiff would provide payment to Defendants for merchandise, upon, and only upon, Defendants' ability and execution to ship said merchandise to Plaintiff, following receipt of payment.

4.4 Plaintiff discussed with Defendant Rick, Plaintiff's implementation of new product line infrastructure to facilitate the sale of said merchandise Plaintiff was to receive from Defendant, over the course of Plaintiff's business season.

4.5 Defendant Rick wanted to have certain minimum purchasing "promises" from Plaintiff, to be fulfilled over the course of Plaintiff's season. In fulfillment of Defendant's request, Plaintiff placed a future order (in oral and written form) from Defendants, in an amount of $18,000, to be paid for by Plaintiff, upon, and only upon, Defendants' ability to and execution of direct subsequent shipping of said merchandise. AND said order was to take action in the month of August, 2005. Plaintiff also placed several other interim orders for various merchandise, to be paid for by Plaintiff, upon, and only upon, Defendants' intent to ship said merchandise, directly subsequent to receipt of payment for said merchandise.

4.6 Plaintiff invested a minimum of 300 payroll and personal hours in the development of the infrastructure, aforementioned as the implementation plan of paragraph 4.4, to carry Defendants' product line (A value of time of at least $12,000).

4.7 After Defendant Rick became aware of Plaintiff's aforementioned infrastructure time investment, said Defendant began to make demands OUTSIDE the scope and terms of Plaintiff and Defendants' agreed upon contractual relationship. Such demands included Defendant's demand that Plaintiff send Defendant a "guarantor of payment" in the form of checks, but to be cashed by Defendants, ONLY with fulfillment of all of the following:

(a) prior authorization from, and agreement by, Plaintiff to have certain checks cashed to cover certain merchandise,

(b) with understanding that Defendants had the particular merchandise in stock at the time any agreements of 4.7 (a) were made, and

(c) direct subsequent intent and performance by Defendants to ship merchandise that would be the result of any agreements of 4.7 (a).

4.8 Plaintiff was told by Defendant Rick, in no uncertain terms, that if he did not meet the aforementioned demand, it wouldn't be "worth his time" to continue to honor the contractual relationship he and Defendant California had initiated with Plaintiff. In an effort to be amenable, and considering the exhaustive time (mentioned herein) Plaintiff invested into the aforementioned infrastructure time investment, Plaintiff agreed to send Defendant Rick (by his specification), a series of $1,000 checks, to be kept, in Defendant Ricks' words, "in my top drawer" as a guarantor of payment for when merchandise was ready to be shipped, and in accordance with and fulfillment of the terms specified in paragraph 4.7, sections (a) (b) & (c). Plaintiff sent said checks, and with said checks (to document oral intent of agreement), a letter stating said checks were only to be cashed with Plaintiff's prior authorization and approval, which would include a direct subsequent intent and performance of shipping of merchandise by Defendants, to Plaintiff. (IMPORTANT NOTE: Defendants are one of the few large scale distributors that do not accept credit cards or C.O.D.'s, or so they purport. Therefore, Plaintiff was forced to pay by check. And since product distribution operates in such a timely manner in this business, and since Plaintiff cannot hold or make merchandise payments over the phone to Defendant Contractors, Defendant Rick insisted that checks be available in his "desk drawer" in advance of receipt of goods, and to be cashed upon 4.7 (a) (b) (c) ).

4.9 Despite the aforementioned agreement of paragraph 4.8, Defendant (s) attempted to cash said checks in <u>BREACH OF CONTRACT.</u> Since Plaintiff keeps only enough money in his product business checking to cover prior agreed upon transactions between Plaintiff and contractors, Defendant (s)' attempted cashing of Plaintiff's "guarantor" checks bounced.

4.10 After the transaction failure of paragraph 4.9 came to pass, Defendant Rick spoke with Plaintiff about said incident. During that conversation, Plaintiff asked Defendant why he had cashed checks without prior authorization and approval from Plaintiff. Defendant responded, "You said you were big time!?" Plaintiff also asked Defendant (for further clarification of events of BREACH OF CONTRACT), what merchandise Defendant <u>was</u> planning to ship in return for <u>forced</u> receipt of payment from Plaintiff. Defendant's reply was that he had <u>NO</u> merchandise to ship Plaintiff. Plaintiff then asked why he cashed Plaintiff's checks with no plan to ship Plaintiff any merchandise whatsoever. Defendant responded, "You're gonna make a big deal over a couple thousand!?" Plaintiff responded by telling Defendant that his agreement with Defendant was not to fund Defendants' business in wait for a potential "futuristic" delivery of merchandise, and informed Defendant of his BREACH OF CONTRACT.

4.11 During the aforementioned phone conversation of paragraph 4.10, Defendant informed Plaintiff that since Plaintiff won't allow Defendant to, in essence, have his "unilateral way" with the contracts (by stealing funds and failing and/or refusing to ship merchandise) that he (defendant) would be taking action tantamount to ANTICIPATORY BREACH of ALL CONTRACTS. Defendant stated that he would not be fulfilling any more of Plaintiff's orders, in ANTICIPATORY BREACH of all CONTRACTS between Plaintiff and Defendant (s), and Defendants' actions thus far have been in accordance with said statement by Defendant Rick.

4.12 Said ANTICIPATORY BREACH of ALL CONTRACTS of paragraph 4.11, included a BREACH of the $18,000 CONTRACT between Plaintiff and Defendant, aforementioned in paragraph 4.5, to be carried into execution in the month of August.

4.13 Because of the uniqueness of many of Defendants' products, and further the agreement of Plaintiff with Defendant, to exclusively purchase certain of Defendants' line only from Defendants, Plaintiff made certain investments, with the CLEAR KNOWLEDGE of Defendant (s), in purpose to prepare for and compliment the new line of products he was and would be receiving from Defendants. SAID INVESTMENTS WERE AS FOLLOWS:

(a) Personal hours by Plaintiff and Payroll hours of Plaintiff's staff in an amount of 300 hours, and a value of $12,000 (aforementioned in paragraph 4.5). This time and financial investment was used to prepare the website back-end for Plaintiff's website: http://www.costumesuperstore.com. Specifically, the website back-end for, ONLY the products that Plaintiff had planned to receive from Defendants, by mutual contract.

(b) Many of Defendants' products required Plaintiff to purchase additional accessories, not sold by Defendants, to complete and/or compliment Defendants' line of products for retail sale by Plaintiff. Plaintiff therefore made several outside purchases in preparation to sell Defendants' product line and in anticipation that Defendant WOULD NOT be BREACHING ALL and EVERY CONTRACT in place between Defendant and Plaintiff. The cost of these ancillary purchases (which Plaintiff put a stop to immediately after learning about Defendants' decision to BREACH ALL CONTRACTS), had reached $2,000 in expense on the part of the Plaintiff. Said $2,000 in products are now "collecting dust" in wait of Defendants' fulfillment of contracts.

(c) An additional 100 hours of payroll and personal hours and materials in preparing marketing of Defendants' product line, in the form of

photography, customer product descriptions, and other internet marketplace posting, in addition to Plaintiff's aforementioned web portal.

4.14 Defendants' failure to ship all of the aforementioned products, and fulfill all of the aforementioned contracts specified in paragraphs 4.1 through 4.13, caused Plaintiff's business damages in the following manner:

(a) Plaintiff had to cancel customer orders placed for products in Defendants' line, since Defendants refused to ship products to Plaintiff for Plaintiff's sale and delivery to said customers.

(b) Said failure to ship said products to customers of the aforementioned paragraph 4.14 (a), caused upset amongst Plaintiff's business customers, which included loss of customers, and poor "feedback" on online retail sites that Plaintiff does business on. Said poor feedback causes many both future and present customers to avoid doing business with retailers in the online marketplace, and specifically caused such with Plaintiff's business.

4.15 Defendants ANTICIPATORY BREACH/REPUDIATION of CONTRACTS, violated Federal Law and Rhode Island Law (Rhode Island Uniform Commercial Code: Breach, Repudiation, and Excuse, § 6A-2-610).

## V. STATEMENT OF FACTS ON DEFAMATION

5.1 Defendant (s) made malicious, false statements about Plaintiff's credit worthiness, to at least one contractor Plaintiff has a product purchasing relationship with, affecting Plaintiff's credit with said contractor. Plaintiff was informed by said contractor, that as a result of said comments by Defendant (s), "Mr. Ligeri [Plaintiff] must pay cash 100% for everything, and will be afforded no credit or purchasing credit leniency."

5.2 In a business where the need for buyer and seller trust is particularly crucial, Defendant (s) false, malicious statements about Plaintiff and his credit worthiness to Plaintiff's contractors, created an atmosphere of distrust and stringency in

Plaintiff's business relationships with said contractors.

5.3 Defendant (s) false, malicious statements to Plaintiff's contractors, about Plaintiff's credit worthiness, tantamount to a strong contributing factor in costing Plaintiff an aggregate purchasing credit with contractors in an amount of $200,000 over the course of Plaintiff's business operating season (extending until October 31st, 2005). Said purchasing credit, if realized, would create tri-fold gross revenue for Plaintiff's business, in an amount of $600,000.

VI. CLAIM FOR RELIEF ON BREACHES OF CONTRACT

6.1 Paragraphs 4.1 through 4.15 are incorporated herein by reference the same as though pleaded in full.

6.2 Defendants actions of paragraphs 4.1 through 4.15 violated Federal Law and the following laws of Rhode Island's Uniform Commercial Code (but not limited to the following laws):

(a) General Obligation of Parties under § 6A-2-301.

(b) Tender of Payment by Buyer - Payment by Check under § 6A-2-511, specifically § 6A-2-511 (1), "Unless otherwise agreed, tender of payment is a condition to the seller's duty to tender and complete any delivery."

6.3 Defendants actions of paragraphs 4.1 through 4.15, created remedies under Federal Law and under the following laws of Rhode Island's Uniform Commercial Code (but not limited to the following laws):

(a) Buyer's Remedies in General - Buyer's Security Interest in Rejected Goods, under § 6A-2-711.

(b) Buyer's Damages for Nondelivery or Repudiation, under § 6A-2-713.

(c) Buyer's Incidental and Consequential Damages, under § 6A-2-715.

(d) Buyer's Right to Specific Performance or Replevin, under § 6A-2-716.

## VII. CLAIM FOR RELIEF ON DEFAMATION

7.1 Paragraphs 5.1 through 5.3 are incorporated herein by reference the same as though pleaded in full.

7.2 Defendants' actions of paragraphs 5.1 through 5.3 violated Federal Law and Rhode Island Law for Defamation in the form of Slander.

7.3 Defendants' actions of paragraphs 5.1 through 5.3 created remedies under Federal Law and Rhode Island Law for Defamation in the form of Slander.

## VIII. REQUEST FOR RELIEF

WHEREFORE plaintiffs pray that the Court enter judgment against Defendants, and each of them, as follows:

1. Compelling specific performance on the part of the Defendant in the above captioned action, to fulfill all contracts;
2. Awarding Plaintiff special damages for economic loss, including payroll expenses, inability to fill customer orders, business losses, lost wages, loss of earning capacity, out of pocket expenses, incidental damages, consequential damages, and any and all other economic losses, in an amount to be proven in trial;
3. Plaintiff requests Defendants be made to make written apology and retraction of all of their false, malicious, defamatory statements they have made to all the applicable contractors said statements were made to;
4. Plaintiff requests Defendants be made to provide a credit purchasing system of $200,000 for Plaintiff's business, to remedy Plaintiff's loss of

credit purchasing power from contractors as a result of Defendant (s) said defamatory statements;

5. Awarding Plaintiff his statutory fees and costs incurred in this action;

6. Awarding Plaintiff any further or additional relief which the court finds equitable, appropriate or just.

//

//

DATED THIS 27 day of May, 2005.

JUSTIN LIGERI
pro se